UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL COMPLAINT |
| v. | : | Mag. No. 19-4582 (LHG) |
| CYNTHIA ELIZABETH TARRAGO DIAZ;<br>RAIMUNDO VA; and<br>RODRIGO ALVARENGA PAREDES | : | |

I, Arthur E. Durrant III, being duly sworn, state that the following is true and correct to the best of my knowledge and belief. On or about the dates set forth in Attachment A to this complaint, in the District of New Jersey and elsewhere:

SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

_____
ARTHUR E. DURRANT III
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

SWORN TO BEFORE ME AND SUBSCRIBED IN MY PRESENCE
NOVEMBER 21, 2019
TRENTON, NEW JERSEY

_____
HON. LOIS H. GOODMAN
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A
(Conspiracy to Commit Money Laundering)

From at least in or around March 2018 to in or around November 2019, in the District of New Jersey and elsewhere, the defendants,

CYNTHIA ELIZABETH TARRAGO DIAZ;
RAIMUNDO VA; and
RODRIGO ALVARENGA PAREDES,

did knowingly and intentionally conspire with each other and others to commit an offense in Title 18, United States Code, Section 1956, namely, money laundering, contrary to Title 18, United States Code, Section 1956(a)(3)(B).

In violation of Title 18, United States Code, Section 1956(h).

ATTACHMENT B

I, Arthur E. Durrant III, am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 1998. The information contained in this complaint is based on my personal knowledge and on information obtained from other sources, including conversations with other law enforcement agents, statements made or reported by various witnesses with knowledge of relevant facts, and my review of documents and evidence obtained through search warrants, court orders, subpoenas, and other sources. Because this complaint is submitted for the limited purpose of establishing probable cause, it does not include every fact that I have learned during the course of the investigation. Where the contents of documents and the actions, statements, and conversations of individuals are recounted herein, they are recounted in sum and substance and in part.

## I. Overview

1. From at least as early as in or around March 2018 to the present, the defendants, and others known and unknown, combined, conspired, and agreed to launder millions of dollars in United States currency, in violation of federal law.

2. As part the money laundering conspiracy, the co-conspirators agreed to accept at least $2 million in United States currency, which they believed to be the proceeds of unlawful narcotics trafficking, and launder such funds through an international network of accounts (the "Money Laundering Network") with the purpose to disguise the unlawful source of the proceeds. In furtherance of the money laundering conspiracy, members of the conspiracy in fact accepted approximately $800,000 in United States currency—funds that had been represented to them to be unlawful narcotics proceeds—and laundered those funds through the Money Laundering Network with the purpose to disguise the unlawful source of the proceeds.

3. Also in furtherance of the conspiracy, and to further disguise the source of the laundered funds, members of the conspiracy generated false and fraudulent invoices purporting to represent legitimate business reasons for the payment of funds to the originating source of the cash proceeds.

4. Although the cash proceeds laundered through the Money Laundering Network were represented to be illicit drug proceeds, in fact, they were not. Instead, the funds laundered by the conspiracy were provided to members of the conspiracy in connection with an undercover FBI investigation of the Money Laundering Network. During the investigation, undercover FBI agents (hereafter, "UC-1" and "UC-2" and together, the "UCs"), representing themselves to be narcotics traffickers in need of laundering the cash proceeds

of their illicit activities, provided two key members of the money laundering conspiracy—defendants CYNTHIA ELIZABETH TARRAGO DIAZ and RAIMUNDO VA—approximately $800,000 in United States currency that the UCs represented were unlawfully obtained narcotics proceeds. In furtherance of the conspiracy, these and other co-conspirators, including defendant RODRIGO ALVARENGA PAREDES and others not named as defendants herein, laundered the funds for the purpose of disguising the ostensibly illegitimate source of the cash.

5.  As part of the undercover investigation, law enforcement obtained substantial video and audio evidence through the UCs' in-person interactions with these key members of the conspiracy, as well as through the UCs' telephonic and electronic communications with these co-conspirators.

## II. The Defendants and Others

6.  At all times relevant to this criminal complaint:

    a.  CYNTHIA ELIZABETH TARRAGO DIAZ ("TARRAGO") was an elected member of Congress in Paraguay until in or around January 2019, and in November 2019, publicly announced her intent to run for mayor of the capital district of Asunción. TARRAGO resided in Paraguay, and actively participated in the Money Laundering Network. On multiple occasions during the conspiracy, TARRAGO traveled to the United States for the purpose of making pickups of cash proceeds from the UCs, which she believed to be illicit narcotics proceeds, to be laundered through the Money Laundering Network. During these visits and as described below, TARRAGO also repeatedly attempted to persuade the UCs to purchase cocaine from Paraguay, which she represented could be sold to the UCs at an inexpensive price.

    b.  RAIMUNDO VA ("VA") was defendant TARRAGO's husband, resided in Paraguay, and actively participated in the Money Laundering Network. On multiple occasions during the conspiracy, VA traveled with TARRAGO to the United States for the purpose of making pickups of cash proceeds from the UCs, which he believed to be drug proceeds, to be laundered through the Money Laundering Network.

    c.  RODRIGO ALVARENGA PAREDES ("ALVARENGA") was a senior-level official of a large money exchange business in Paraguay, and was an associate of TARRAGO and VA. In furtherance of the conspiracy, ALVARENGA coordinated significant aspects of the Money Laundering Network. During the investigation, law enforcement obtained a search warrant to obtain electronic materials from ALVARENGA's telephone, which had been backed up to a cloud account. The materials that law enforcement obtained pursuant to the search warrant included tens of thousands of chat messages between

ALVARENGA and other co-conspirators, which revealed the nature of the Money Laundering Network, and the extent of ALVARENGA's and other individuals' participation in it. Unless specified otherwise, all communications described below between ALVARENGA and others were obtained pursuant to the search warrant of ALVARENGA's cloud account.

        d.    Co-conspirator 1 ("CC-1"), not named as a defendant herein, was a resident of the United States and participated in the Money Laundering Network. CC-1 was the President of Co-conspirator Company 1 ("CC Co. 1"), a company headquartered in the State of New York, which members of the conspiracy used to launder United States currency represented to be proceeds of unlawful drug trafficking.

        e.    Co-conspirator 2 ("CC-2"), not named as a defendant herein, was a resident of the United States and participated in the money laundering conspiracy. CC-2 was the United States representative of Co-conspirator Company 2 ("CC Co. 2"), a company headquartered in the State of California, which members of the conspiracy used to launder United States currency represented to be proceeds of unlawful drug trafficking.

        f.    Co-conspirator 3 ("CC-3") was a resident of Paraguay, and an associate of ALVARENGA. CC-3 actively participated in the money laundering conspiracy described in this criminal complaint.

### III.    The Investigation

*Law Enforcement's Initial Contacts With TARRAGO and VA*

    6.    In or around March 2018, the UCs attended an event in New Jersey, where they met VA for the first time. At that event, VA gave TARRAGO's e-mail address to UC-1 and, thereafter, TARRAGO and UC-1 communicated via email. Later, in or around May 2018, TARRAGO contacted UC-1 via text message and, thereafter, TARRAGO and UC-1 communicated numerous times via traditional text message and through an electronic chat messenger account.

*The November 2018 Meeting and $10,000 Money Laundering*

    7.    In or around November 2018, TARRAGO and VA flew into New York from outside the United States. During their trip, TARRAGO and VA met with UC-1 at their hotel in New York City (the "NYC Hotel"). At that meeting, UC-1 expressed a need to launder money that was the proceeds of unlawful narcotics trafficking. In response, TARRAGO and VA discussed opening accounts in Paraguay on UC-1's behalf. VA also provided his telephone number to UC-1.

5

8. Later during their trip to New York, TARRAGO and VA met UC-1 at the NYC Hotel. The three then drove to another location in or around Jersey City, New Jersey. During the drive from the NYC Hotel to the Jersey City location, TARRAGO and VA detailed how inexpensive cocaine and marijuana are in Paraguay. TARRAGO and VA told UC-1 that they could get the drugs out of Paraguay, but that UC-1 would need to get the drugs into the United States. Later in the conversation, TARRAGO and VA told UC-1 that they, in fact, had a network that could import the drugs into the United States.

9. Also during the drive from the NYC Hotel to the Jersey City location, VA told UC-1 that Paraguay was a good place to launder money because it was not on the United States government's "radar." VA also told UC-1 that their network charged a fifteen percent fee to launder the funds. However, TARRAGO stated that number could go down if UC-1 laundered a significant amount of money through their network. TARRAGO and VA described in detail how the Money Laundering Network operated. Among other things, TARRAGO explained that she would use code words to discuss the commission rates. TARRAGO then wrote the code word "remera" (which translates to "shirts") on a piece of stationary from the NYC Hotel and handed it to UC-1.

10. After TARRAGO, VA, and UC-1 arrived at the location in Jersey City, VA discussed with UC-1 the need to create false paperwork in case there was ever an investigation. Specifically, VA said that a company purportedly owned by UC-2 (hereafter, "UC Co.") should generate fake invoices and send them to the representatives of the Money Laundering Network. TARRAGO said they would discuss the details of the fake invoices with an accountant when they got back to Paraguay. TARRAGO, VA, and UC-1 agreed to a test run using $10,000 in United States currency. As part of the test run, the UCs would provide the $10,000 to TARRAGO and VA, and the Money Laundering Network would thereafter wire back laundered funds to an account specified by UC-1. In furtherance of this arrangement, UC-1 handed $10,000 in cash to TARRAGO. TARRAGO then counted the cash, and handed it to VA, who then re-counted the cash and put it into a black bag. TARRAGO, VA, and UC-1 agreed that if this test-run was successful, they would meet again in Miami, Florida and launder $300,000 in drug proceeds through the Money Laundering Network.

11. On the drive back from Jersey City to the NYC Hotel, VA again discussed his "projects" with UC-1. Specifically, VA said that his "projects" were both a good way to launder money and a good investment in themselves.

12. Thereafter, TARRAGO and VA flew back to Paraguay. Upon their return, TARRAGO and UC-1 communicated via text message, and discussed a (thirteen percent) fee for the upcoming transaction, using the agreed-upon code

word "13 remeras." On or about November 21, 2018, TARRAGO e-mailed UC-1 and used the agreed-upon cover story for a $10,000 wire coming from Paraguay to the United States. As agreed, UC-1 then e-mailed a fake invoice from UC Co. for $9,800 to TARRAGO. On or about November 30, 2018, TARRAGO wired $2,800 to a bank account established for this investigation for UC Co. (hereafter, the "UC Bank Account"). The details section of the wire referred to the fake invoice number that UC-1 had sent to TARRAGO. Thereafter, the UC Bank Account received a wire transfer from TARRAGO for $4,421; the details section of the wire confirmation referred to the fake invoice number.

*The December 2018 Meeting and $100,000 Money Laundering*

13. In or around December 2018, TARRAGO contacted UC-1, who informed TARRAGO, using the previously agreed upon code, that UC-1 would bring $100,000 in United States currency to Miami, Florida for the purpose of laundering these funds through the Money Laundering Network. In response, TARRAGO asked UC-1 to bring $300,000 instead. Based upon the defendants' prior discussions with the UCs, TARRAGO and VA believed that these funds were proceeds of unlawful drug trafficking.

14. On or about December 9, 2018, UC-1 flew from New Jersey to Florida. TARRAGO and VA met UC-1 at a hotel in or around Sunny Isles Beach, Florida (the "Florida Hotel"). UC-1 informed TARRAGO and VA that UC-1 had $100,000 in United States currency to launder. TARRAGO and VA told UC-1 that the Money Laundering Network expected $300,000, not $100,000. TARRAGO and VA asked UC-1 to try to obtain $300,000. They then agreed to meet the following morning.

15. On the morning of December 10, 2018, TARRAGO and VA met UC-1 in UC-1's room at the Florida Hotel. UC-1 brought a pink bag (the "Pink Bag") containing $100,000 in United States currency. TARRAGO and VA then counted the currency, and put it back into the Pink Bag. TARRAGO and VA then left UC-1's room, and drove with the Pink Bag to an office building located in or around Miami, Florida. Surveillance video obtained from that office building showed TARRAGO and VA getting onto the elevator with the Pink Bag, getting off the elevator with the Pink Bag on an upper floor of the building, and returning to the elevator less than five minutes later without the Pink Bag.

16. Also on December 10, 2018, ALVARENGA and VA exchanged chat messages, in which VA asked whether ALVARENGA had written down the account number of "the business" where the laundered funds needed to be sent. In response, ALVARENGA sent a screen shot of a note containing the name and account details for the UC Bank Account. VA responded with a two-thumbs-up emoji. During the same conversation, ALVARENGA also asked VA what had been "agreed to" and what the "exact value" was. VA replied, "85,"

referring to the $85,000 that would be laundered and returned to the UCs. ALVARENGA then responded, "Ok."

17. Separately, during or around the same time period, TARRAGO and ALVARENGA exchanged chat communications regarding the money to be laundered. In sum and substance and among other things, TARRAGO informed ALVARENGA that she and VA would provide "85" and that it would be necessary to send "to the bill 82," and that ALVARENGA could keep the remaining "3000." In other words, TARRAGO explained that $82,000 would need to be laundered and returned to the UCs, and that ALVARENGA would receive $3,000. Consistent with that message, the same day, on or about December 10, 2018, TARRAGO and UC-1 exchanged text messages, during which TARRAGO told UC-1 that the money-laundering transactions were in progress, but that the fee would be 18% instead of 15%. Accordingly, with that fee, the UCs could expect to receive $82,000 in laundered funds.

18. The next day, on or about December 11, 2018, TARRAGO exchanged chat messages with ALVARENGA. During the conversation, ALVARENGA asked TARRAGO whether she and VA had dropped off "75 or 85" to another co-conspirator in the Money Laundering Network, hereafter referred to as "CC-4." TARRAGO responded, "85," and in separate messages, stated, "Of which 82 have to go to the bill," and "3 are yours." TARRAGO then mentioned future money laundering of $300,000: "And in two or three weeks we would make the amount of 300 that we discussed." ALVARENGA requested that TARRAGO confirm that she and VA had, in fact, dropped off $85,000. TARRAGO first responded that she and VA were certain that they had dropped off "85" to CC-4, but she ultimately corrected herself and advised that they actually had only dropped off $75,000, and would take the remaining $10,000 to CC-4 the following day. The context and content of these communications revealed that ALVARENGA coordinated CC-4's pickup of money from TARRAGO and VA after they had received it from the UCs.

19. Between on or about January 10, 2019 and January 11, 2019, ALVARENGA exchanged chat messages with CC-3 concerning the deposits by CC-1 into the UC Bank Account. Among other things, CC-3 identified the name and address for CC Co. 1—*i.e.*, the entity that would deposit or transfer the laundered funds into the UC Bank Account—and expressed concern regarding VA: "I worry about Raymond's thing." ALVARENGA responded by referring to CC-1 by name, "Is it that [CC-1] will not show up? Tomorrow." The following day, CC-3 stated to ALVARENGA that he would "stop by your office . . . and we'll also look into the matter regarding [CC-1]." Also on or about January 10, 2019, TARRAGO sent a text message to UC-1 stating that the laundered funds would be sent to the UC Bank Account from an account held in the name of CC Co. 1. In other words, TARRAGO identified the same transferor company to UC-1 that CC-3 had identified to ALVARENGA.

8

20.     On or about January 11, 2019, CC-3 sent ALVARENGA a photograph of a check from CC-1 for $10,000 payable to UC Co. On or about January 17, 2019, CC-3 sent ALVARENGA a photograph of a deposit slip for a separate deposit into the UC Bank Account for $22,000. As described below, the UC Bank Account ultimately was credited with, among other things, corresponding deposits of $10,000 and $22,000, which CC-1 made.

21.     Between on or about January 11, 2019 and on or about February 4, 2019, the UC Bank Account was credited with several deposits totaling approximately $82,000—representing money laundered from the $100,000 in purported drug proceeds that the UCs had provided to TARRAGO and VA, minus the 18% fee that TARRAGO had identified. These deposits are described as follows:

   a.   On or about January 11, 2019, the UC Bank Account was credited with a $10,000 official check drawn on an account held in CC-1's name. Photographs and documents obtained by law enforcement show CC-1 the previous day purchasing a $10,000 check drawn on CC-1's account. Likewise, photographs and documents obtained by law enforcement show CC-1 depositing the $10,000 check into the UC Bank Account.

   b.   On or about January 16, 2019, the UC Bank Account was credited with a $22,000 check. Photographs and documents obtained by law enforcement showed CC-1 depositing the check into the UC Bank Account.

   c.   On or about February 4, 2019, a wire transfer in the amount of $50,000 was credited to the UC Bank Account. The wire originated from an account held in the name of CC Co. 2. The same day that the transfer was received, ALVARENGA exchanged audio messages with an associate, in which ALVARENGA advised that he had given the account name to VA, and that that he (ALVARENGA) also had told another associate to pay the account $50,000. The same day, ALVARENGA also sent VA a screen shot of a confirmation that confirmed the $50,000 wire transfer from CC Co. 2 to the UC Bank Account.

*The February 2019 Meeting and $290,000 Money Laundering*

22.     On or about February 6, 2019, UC-1 communicated with TARRAGO via telephone and chat messages about "300 t-shirts," *i.e.*, code for laundering an additional $300,000, meeting in Miami in or around

February 2019 to obtain the $300,000, and to provide paperwork for the previously laundered $100,000.

23. On or about February 7, 2019, ALVARENGA and VA exchanged chat messages, during which VA expressed a need for "paperwork"—in context, fraudulent invoices to be used to make the laundered funds appear as though they were for legitimate services. The same day, ALVARENGA sent CC-3 several messages requesting the "TIN" (taxpayer identification number) and the "address for the companies" "in regard to [CC-1]'s matter." CC-3 responded with an audio message that explained, in sum and substance, that that information was not required. Separately, on or about February 8, 2019, ALVARENGA sent VA a blank invoice for CC Co. 2.

24. On or about February 9, 2019, the UCs met with TARRAGO and VA at the Florida Hotel, and discussed the associated paperwork for the $82,000 in deposits into the UC Bank Account. At the meeting, TARRAGO and VA gave the UCs a fraudulent invoice for $50,000, purportedly from UC Co. and directed to CC Co. 2, for a "market feasibility study." VA commented that CC Co. 2 was "part of the network." In addition, TARRAGO and VA gave the UCs a fraudulent invoice for $32,000, again purportedly from UC Co., but directed to CC-1, for "sport socks" and other "custom design" services. Together, these fraudulent invoices matched the amount of laundered funds ($82,000) that had been received in the UC Bank Account in January and February 2019 as described above. Moreover, the invoices were consistent with the communications that ALVARENGA had exchanged with his associates. During the meeting with the UCs, VA also described, in sum and substance, how he had used false loan agreements and consulting agreements to conceal the origins of funds in the past. During this meeting, TARRAGO and VA also described their ability to procure cocaine from Paraguay, as they had done during their prior meetings with the UCs.

25. On or about February 20, 2019, the UCs again met with TARRAGO and VA at the Florida Hotel and further discussed future paperwork to be generated for the next batch of laundered proceeds. To that end, the UCs gave TARRAGO and VA approximately $343,000 in United States currency: $300,000 was contained in two large bags, $39,000 was contained in a small yellow bag (the "Small Yellow Bag") and an additional $4,000. TARRAGO stated that she and VA would have to stay in Florida longer than they initially intended to be able to launder the $300,000 and, therefore, they would incur additional expenses, which she estimated would be approximately $10,000. TARRAGO and VA also again discussed the possibility of importing cocaine from Paraguay.

26. The following day, on or about February 21, 2019, ALVARENGA and VA exchanged chat messages, during which they discussed a pickup of "130" from the Florida Hotel—in context, $130,000. During the chat messages,

VA described to ALVARENGA what he was wearing, so that ALVARENGA could communicate that information to the individual who would pick up the $130,000 from VA.

27. On or about March 7, 2019, ALVARENGA coordinated a pickup of $60,000 from VA at the Florida Hotel. More specifically, ALVARENGA exchanged a number of chat messages with a co-conspirator not named as a defendant herein ("CC-5") regarding the pickup. ALVARENGA and CC-5 agreed that CC-5's brother, a co-conspirator not named as a defendant herein ("CC-6"), would meet VA at the Florida Hotel and pick up $60,000 from VA. CC-5 and ALVARENGA further agreed that CC-5 would earn a 3% fee for the pickup. Separately, on or about March 7, 2019 and March 8, 2019, ALVARENGA and VA exchanged chat messages in which ALVARENGA informed VA that an individual (*i.e.*, CC-6) would meet VA at the Florida Hotel to make the pickup of $60,000. Thereafter, on or about March 8, 2019, VA met with CC-6) in the lobby of the Florida Hotel. At that meeting, VA handed CC-6 a bag that VA had carried down from his room in the Florida Hotel. Thereafter, also on or about March 8, 2019, ALVARENGA separately confirmed with both VA and CC-5 that CC-6 had made the pick-up.

28. Between on or about March 15, 2019 and on or about May 22, 2019, the UC Bank Account was credited with a total of $290,000 in deposits, representing money laundered from the $343,000 in purported drug proceeds that the UCs provided to TARRAGO and VA, minus the Money Laundering Network's fee. The deposits received in the UC Bank Account, and communications regarding them, are listed below:

   a. On or about March 15, 2019, the UC Bank Account received a $100,000 wire transfer from CC Co. 2's account. The same day, ALVARENGA sent VA a message asking, "You confirmed 100 in your account?"—in context, that $100,000 had been transferred to the UC Bank Account.

   b. On or about March 25, 2019, the UC Bank Account received a $30,000 wire transfer from CC Co. 2's account. The same day, ALVARENGA sent VA a screenshot reflecting a wire transfer to the UC Bank Account, along with a message that read "30 thousand more."

   c. On or about April 16, 2019, the UC Bank Account received a $35,000 wire transfer from another account. Chat messages obtained from ALVARENGA's cloud account revealed that ALVARENGA coordinated the transfer of this money into the UC Bank Account. Indeed, on or about April 9, 2019, ALVARENGA sent a screen shot to VA of wire transfer instructions for $35,000 to the UC Bank Account, with

        UC Co. listed as the beneficiary. ALVARENGA asked VA to confirm that the information for the transfer was correct, and VA responded that it was. On or about April 16, 2019, the day that that $35,000 wire transfer was made, ALVARENGA sent a message to VA that read, "Your 35 is there."

    d.    On or about April 17, 2019, the UC Bank Account received two wire transfers totaling $117,500—one for $45,210 and one for $72,290—from CC Co. 1's account.

    e.    On or about May 22, 2019, the UC Bank Account received two wire transfers totaling $7,500—one for $6,500 and one for $1,000—from another account.

    29.    During this time period, ALVARENGA discussed and coordinated the creation of fraudulent invoices to explain and disguise the wire transfers to the UC Bank Account. For example, on or about March 21, 2019, ALVARENGA engaged in a conversation with CC-3 regarding information potentially to be included in fraudulent invoices purportedly issued by UC Co. Among other things, CC-3 suggested, in sum and substance, that UC Co.'s invoices include information for services performed in connection with one of CC Co. 1's actual clients. Five days later, on or about March 26, 2019, TARRAGO sent a text message to UC-1 that contained the very same information that CC-3 had proposed to ALVARENGA. Moreover, in or around May 2019, TARRAGO and VA provided the UCs fraudulent invoices purportedly issued by UC Co. containing this very same information.

### *The May 2019 Meeting and $300,000 Money Laundering*

    30.    On or about May 28, 2019, the UCs met with TARRAGO and VA at the Florida Hotel, and discussed the associated paperwork for the various deposits that had been made into the UC Bank Account. Among other things, TARRAGO and VA provided the UCs numerous fraudulent invoices purportedly from UC Co. and directed to CC Co. 2, to cover the payments received in the UC Bank Account between March 2019 and May 2019. The UCs informed VA and TARRAGO, in sum and substance, that not all of the payments had come from CC Co. 2's account, and thus the fraudulent invoices would not be sufficient to disguise the nature of all the payments. VA concurred, and agreed to provide the UCs corrected invoices at a later date. During the meeting, TARRAGO and VA again discussed their ability to procure cocaine from Paraguay.

    31.    The next day, on or about May 29, 2019, the UCs again met with TARRAGO and VA at the Florida Hotel and further discussed future paperwork to be generated for the next batch of laundered proceeds. During the meeting,

the UCs gave TARRAGO and VA approximately $340,280 in United States currency, representing purported drug proceeds: $300,000 to be laundered by the Money Laundering Network and $40,280 for "fees and expenses." The $300,000 in cash was contained in a blue and yellow duffel bag (the "Blue and Yellow Bag"), $39,000 was given to TARRAGO and VA in a smaller blue sports bag (the "Small Blue Bag") and an additional $1,280 was given directly by UC-1 to TARRAGO. TARRAGO and VA then left UC-1's hotel room with the Blue and Yellow Bag containing $300,000, the Small Blue Bag containing $39,000, and the $1,280 in TARRAGO's pants' pocket.

32. Thereafter, on the same day, VA met briefly with an unidentified male in the lobby of the Florida Hotel, who departed with the Blue and Yellow Bag. Shortly thereafter, a co-conspirator not named as a defendant herein ("CC-7") arrived at the Florida Hotel, and met VA in the lobby. At or around this time, the unidentified male returned to the hotel lobby holding the Blue and Yellow Bag, and met with VA and CC-7. Thereafter, the unidentified male left the Florida Hotel carrying the Small Yellow Bag referenced in paragraph 25, above, and CC-7 left the hotel carrying the Blue and Yellow Bag.

33. Between on or about June 10, 2019 and on or about November 15, 2019, the UC Bank Account was credited with $294,800 in deposits, representing money laundered from the $300,000 in purported drug proceeds that the UCs provided to TARRAGO and VA. These deposits are listed below:

    a. On or about June 20, 2019, the UC Bank Account received a wire transfer in the amount of $60,000.

    b. On or about August 21, 2019, the UC Bank Account received a wire transfer in the amount of $43,800.

    c. On or about August 22, 2019, the UC Bank Account received a wire transfer in the amount of $55,000.

    d. On or about October 29, 2019, the UC Bank Account received a wire transfer in the amount of $93,000.

    e. On or about November 15, 2019, the UC Bank Account received a wire transfer in the amount of $43,000.

34. On or about November 21, 2019, TARRAGO and VA flew into Newark, New Jersey for the purpose of meeting with the UCs to receive additional funds to launder, and to provide paperwork relating to the funds that previously had been laundered by the conspiracy. Upon meeting with the UCs in a hotel room located in or around Newark, law enforcement placed TARRAGO and VA under arrest.